FIRST NATIONAL BANK OF OMAHA, APPELLANT, V. JOHN M. FLANNIGAN ET AL.: FIRST NATIONAL BANK OF NAPER ET AL., APPELLEES.

FILED FEBRUARY 11, 1932. No. 28124.

*Finlayson, Burke & McKie* and *J. A. Donohoe*, for appellant.

*John A. Davies, contra.*

Heard before ROSE, GOOD and EBERLY, JJ., and CARTER and CHASE, District Judges.

PER CURIAM.

This is a proceeding in equity in the district court for Boyd county, Nebraska, to impress a trust in favor of the First National Bank of Omaha, as plaintiff, upon certain property alleged to be in the possession of the defendants.

At the trial of the case, by agreement of all parties, it was stipulated (so far as the questions before us are concerned) "that the only issues to be tried and considered * * * were the issues between the plaintiff, the First National Bank of Omaha, Nebraska, and the defendant, Robinson, as receiver of the First National Bank of Naper, Nebraska,' as to the ownership of said sum of $1,737 paid to the clerk of the district court of Boyd county" by the First National Bank of Butte, Nebraska, representing two checks aggregating $1,737, of which G. W. Short and Walter S. Peacock were the makers.

Upon the issues, thus limited, a trial on the merits resulted in a finding in favor of the First National Bank of Naper that "the money heretofore paid into court, to wit, the sum of $1,737, by Walter S. Peacock and G. W. Short was the property of the First National Bank of Naper," and a judgment in favor of the latter institution thereon. Thereupon, after motion for a new trial had been denied, the plaintiff bank appeals.

The controversy grows out of the following facts: On June 19, 1930, Bert Hoyt and Jesse Hoyt executed and delivered to John M. Flannigan their promissory note for $9,450, secured by a mortgage on 266 head of mixed cattle. The mortgage was properly filed. Before the maturity of the note it was sold and indorsed by the payee to the First National Bank of Omaha, which thereby became the *bona fide* holder thereof for value. The chattel mortgage was also assigned to this bank.

After maturity of this note, the Hoyts, on October 27, 1930, executed and delivered to E. F. Jepsen, an assistant cashier of the First National Bank of Omaha, a bill of sale of the mortgaged cattle, and also a written agreement which permitted the Hoyts to retain possession of the mortgaged cattle, and to sell the same at any time up to November 15, 1930, and to account for the proceeds of such cattle to the First National Bank of Omaha. This written agreement further provided: "In the event that the same are not so sold, prior to said date (November 15, 1930)',

said parties of the first part (the Hoyts) agree to sell all of said cattle hereinabove described, and not sold as provided in paragraph 3 hereof, at public sale on November 15, 1930, the proceeds of such sale to be remitted to said E. F. Jepsen at once to be applied on the indebtedness of said parties of the first part to the First National Bank of Omaha up to the amount of said note.

"5. It is further agreed that, in the event said parties of the first part fail to sell said cattle as provided in paragraphs 3 and 4 hereof, then said parties of the first part agree to deliver said cattle so remaining unsold to said E. F. Jepsen either at the farm of said parties of the first part, or at Newport, at the option of said E. F. Jepsen."

Jepsen never made demand for possession of the cattle under the paragraph last above quoted. A sale of all the cattle was held at public vendue on the 17th of November. The reason given in the record for this extension of the time of the sale was that as November 15, 1930, was on Saturday, it was deemed "a poor sale day," and by mutual consent the sale was advertised for and held on Monday, November 17. This sale was evidently satisfactory to all parties. Appellant states in its brief: "As a matter of local convenience, and in order to prevent the impression that the sale was forced, the cattle were advertised in the handbills of the sale as the cattle of Bert Hoyt and Jesse Hoyt."

One of the sale bills in the record before us shows that John M. Flannigan and Fred A. Putnam were advertised as the clerks thereof, and all parties admit they acted as such. E. F. Jepsen, an assistant cashier of the Omaha bank, and its trustee under the bill of sale, one of the witnesses in this case, testified in reply to questions propounded by the trial court, on this subject, substantially as follows: That Flannigan represented him and his bank at this sale. That Putnam came to it at the request of John M. Flannigan. That Flannigan was his (Jepsen's) representative and his clerk, and "was really the clerk." That Jepsen did not know that Putnam was coming until he saw

the bills advertising the sale, and that he understood the latter was merely Flannigan's assistant and took his instructions from Flannigan, the chief clerk. The evidence, as an entirety, plainly discloses that Putnam had no contractual relations with either Jepsen or with his bank, and that his employment was as a mere assistant to Flannigan, and was thought desirable because of his more extended acquaintance with the inhabitants of the neighborhood wherein the sale was held. The sale, as already disclosed, took place on November 17, and Jepsen, representing himself and the bank, was present. All of the property was sold. Certain purchases required bills of sale executed by Jepsen for the Omaha bank, and these were furnished by Jepsen. The sheriff of the county collected some four hundred odd dollars in personal taxes of the Hoyts, the payment of which was authorized by Jepsen out of the proceeds of the sale. Jepsen also knew that the purchasers of the property sold were paying for the same in part by their checks, drawn in favor of the clerks, a course of business to which Jepsen, at the time of the sale and at the time of the purchases, made no objection. About the close of the sale Jepsen asked Flannigan as to the delivery of the proceeds of the sale, and to this question Flannigan replied that he would turn over the proceeds as soon as they had been entirely collected, and that he would make settlement with Jepsen in Stuart. Jepsen offered no protestation to this proposed plan of procedure. At the close of the sale Flannigan proceeded to Naper, and at the First National Bank at that place turned into that bank certain checks which had been received from purchasers at the sale. Some of these checks were drawn upon the Naper bank. Some were checks on other banks which were convenient for the Naper bank to handle in the course of collection. For convenience in taking the proceeds of the sale to Stuart, Flannigan asked that the First National Bank of Naper issue to him a cashier's check to cover the checks so cashed. The evidence discloses that this bank is a small one, and had not been in the habit of making

use of this class of negotiable instruments in its business, and was without the necessary blanks. It also appears quite evident from the record that it was short in cash and exchange, and in lieu of a cashier's certificate, and for the purpose of transmitting the proceeds of the checks that had been turned over to it, it issued to Flannigan a negotiable certificate of deposit, payable on demand and to his order, in payment for the checks drawn on itself, as well as those drawn on other banks which it had cashed for Flannigan, and which totaled $4,967.01. Included in this sum was the $1,737, the amount in suit, represented by checks drawn by Peacock and Short on the First National Bank of Butte, Nebraska, and which, duly indorsed, were turned over and delivered to the First National Bank of Naper, Nebraska, as part of the transaction just related.

Payment of these checks was refused on their presentation by the First National Bank of Butte, because of insufficient funds. This occurred on the 18th of November, 1930, and on the 20th following the checks were again presented for payment and again refused; at this time because of the demand made on behalf of the First National Bank of Omaha for the proceeds thereof. Ultimately the sum of $1,737 was, by order of court, paid to the clerk of the district court for Boyd county, where it remained awaiting the determination of its ownership by the trial court. On the 1st day of December, 1930, the certificate of deposit issued to John M. Flannigan was satisfied by the First National Bank of Naper. Evidence in the record sustains the conclusion that the entire proceeds of the Hoyt cattle sale, the facts of which have been heretofore recited, were deposited in the Citizens Bank of Stuart on November 20, 1930, to the credit of the Hoyts, where, so far as disclosed by the record, this sum still remains. It thus appears that John M. Flannigan was the agent of the appellant bank in the cattle transaction; that every act which was done at the sale was in pursuance to their express authority and indeed ratified and confirmed by their representative on the ground, and with knowledge of

the facts. The checks received were payable to the order of the person acting as clerk; the representative of the appellant bank made no objection to Flannigan's purpose, known to him, of retaining the checks and collecting them prior to making complete settlement. The $4,967.01 in checks was turned over to the First National Bank of Naper to accomplish this plan. A negotiable instrument for the convenience of Jepsen's agent was issued by the Naper bank to Flannigan, then acting as the agent of both Jepsen and the First National Bank of Omaha, for use in the transmittal of these proceeds to the Citizens Bank of Stuart, at which Flannigan was to make settlement with the Omaha bank's representative. It was actually deposited in the Citizens Bank of Stuart on the 20th day of November, 1930, to the credit of the Hoyts, and, so far as disclosed by the record, still remains in that condition. Wholly irrespective of the question of notice as to the consideration for which the checks were given, nothing has occurred which subjects the assets of the First National Bank of Naper to any charge on account of the business it transacted. In a manner contemplated and authorized by his instructions, Flannigan admittedly received and, in the usual course of business, cashed the checks, the proceeds of which are in suit. Under the circumstances the Naper bank became the *bona fide* owner thereof. There is nothing in the entire transaction upon which a right to a preference as the owner of a trust fund can be sustained against this defendant, the First National Bank of Naper.

It follows, therefore, that the action of the trial court in its finding and judgment for that institution is correct, and it is

AFFIRMED.